## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| ELIZABETH CARDONA and | : | |
| JERARD BROWN, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CASE NO.:   18-cv-02838-SCB-JSS |
| | : | |
| VIVINT SOLAR, INC., | : | |
| VIVINT SOLAR DEVELOPER, LLC, and | : | |
| SOLAR MOSAIC, INC., | : | |
| Defendants. | : | |

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
### VIVINT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

**"We've been in contact with the ow[n]ers of Vivint about misuse of credit pulls like this and it's being addressed by their leadership."[1]**

This damning statement by Mosaic from January 2017, and others like it, demonstrate that Vivint's summary judgment briefing – claiming Plaintiffs' case is "nothing but smoke and mirrors" to "create the illusion of pattern and practice evidence" – is simply an attempt by Vivint to shift focus from its demonstrable record of forgery, fraud, and impermissible credit pulls.

Vivint's motion pretends that reams of pattern evidence do not exist.  It ignores that it can only act through its salesmen, each of whom has a history of impermissible credit pulls and consumers' accusations of forgery.  Vivint runs away from the fact that it put powerful tools to commit fraud, i.e. its iPad loaded with public records data and easily manipulable electronic form documents, in the hands of these young salesmen motivated to make a sale at all cost. Incredibly, Vivint argues these flawed forms and these salesmen should be believed over the

---

[1]       (Ex. 33, Select Phone Calls between SM and Consumers, SM 419).  Documents bearing the "Solar Mosaic_Cardona-Brown" bates label have been abbreviated to "SM."  Similarly, Plaintiffs at times refer herein to Solar Mosaic as "Mosaic" or "SM."  The Vivint Solar defendants are at times referred to as "Vivint" or "VS."

stories of the victimized consumers like the Plaintiffs here, disinterested in Vivint's product and shocked by the invasion of their credit privacy. Vivint's claim that it did not "use" the Plaintiffs' credit reports is factually inaccurate. For the reasons set forth herein, summary judgment should be denied.

## II.   FACTS

**Plaintiff Elizabeth Cardona's Claims**

1 – 3.   Admitted.

4.   Denied.   Both Plaintiffs had their credit reports pulled without consent by Defendants, and exemplify Defendants' pattern and practice of violating the FCRA in Florida. (Ex. 1, Brown Cert. ¶¶1–8, 17–19; Ex. 2, Cardona Cert. ¶¶1–15).

5.   Admitted only that Martins is a door-to-door salesman who made an unexpected "cold-call" to Ms. Cardona's home to pitch Defendants' solar products. At some point after this meeting, Mosaic ran Ms. Cardona's credit. (Ex. 18, Cardona Dep. 45:14-60:02). The balance of this averment is denied as stated.

6.   Admitted.   The PCCF is a forgery. (Ex. 2, Cardona Cert. ¶¶7–15; Ex. 18, Cardona Dep. 47:02-50:16). Anyone can complete the iPad based PCCF, and there is no objective indicia that the PCCF is completed by the consumer, as opposed to the salesman (in whose hands the iPad resides). (Ex. 3, VS Dep. (E. Pack) 56:24–57:08). The salesman, Martins, further adulterated Ms. Cardona's email address, leaving out a digit. (Ex. 2, Cardona Cert. ¶11; Ex. 18, Cardona Dep. 47:02-50:16). This would assure that the unsuspecting victim, Ms. Cardona, would <u>not</u> see a copy of this forged document. (Ex. 3, VS Dep. (E. Pack) 74:18–75:06).

Vivint salesmen around the country use this tactic of a slightly "off" email address to hide important documents from consumers. In a similar case in federal court in New Jersey, a

Vivint salesman named Philip Chamberlain specifically admitted adding a digit or numeral to a consumer's e-mail address deliberately knowing it was incorrect, with the understanding that doing so would prevent the document from being provided to the consumer, something Chamberlain learned from other sales reps in his first year on the job with the company (2015-2016). (Ex. 4, Chamberlain 5/9/2019 Dep. 32:18-34:19, 43:10–46:15, 104:11–109:17, 112:20–115:15, 145:08–146:06).

Vivint's salesmen, like Martins and Coan, are incentivized to fraudulently complete the PCCF because they must meet certain sales goals for their sales activity.  At minimum, each salesman must log three "accounts created" per week. (Def. VS's Ex. 15, Briant Katilus Dep. 109:15-112:15).  An account created is initiated once credit is run.  (Id.). If a salesman does not meet his minimum standards, he can be subject to discipline including termination. (Id)

According to Evan Hendricks, an expert in the field of credit reporting and consumer privacy, the Defendants "placed manipulatable electronic forms in the hands of their agents, who were motivated to make a sale, and failed to establish policies to curb the potential for abuse." (Ex. 15, Plaintiff's Expert Report of Evan Hendricks).

There is a pattern and practice of fraud, forgery and impermissible credit pulls by Vivint and Mosaic. Even before the salesmen visited Plaintiffs, both Defendants had notice of fraud, forgery, and impermissible credit pulls on multiple occasions in the months preceding the incidents in this case, set forth in the documents attached as Exhibit 20 hereto, including:

- December 2016 – AF (a veteran deployed to Afghanistan at the time his credit was pulled): "No contest has been received from Vivint so this is being resolved as a confirmed case of Fraud. If any evidence arises in the near future we are willing to reopen and reevaluate."  SM 382-83; phone recording at Ex. 33, at SM 181).

- November 2016 – DG: "closing this as confirmed fraud due to the lack of notification of homeowner on credit pull." – SM 372–373.

3

- October 2016 – SR: "At Mosaic, we take our customers' private information very seriously. If you did not authorize anyone to run your credit then we will escalate this issue immediately." SM 355.

Mosaic told Vivint no less than 10 times that Vivint should retrain their salespersons. For instance, Mosaic told Vivint: "Please use this as a training opportunity for your sales reps to inform borrowers when their credit is run and that the credit is a hard inquiry. In this particular case, it is troubling that the credit run was done via an email which does not belong to a homeowner. Please address this with the sales rep." (Ex. 20, SM 564; see also, e.g., SM 443, 453, 464, 479, 485, 569, 575, 629, and 665).[2]

Notice of salesperson misuse of credit pulls and/or any problem relating to impermissible pulls was even conveyed by Mosaic to the upper management at Vivint, Chief Commercial Officer Thomas Plagemann, Vivint Chief Sales Officer Chance Allred, and Vivint Chief Revenue Officer Paul Dickson. (Ex. 21, Mosaic's Responses to Plaintiff's Second Interrogatories).

7.     Admitted that Cardona submitted a BBB complaint.  The rest is denied.  Mosaic asked the credit bureaus to remove the hard inquiries from Ms. Cardona's credit reports in October 2018, only after she was constrained to sue them in this case.  (Ex. 2, Cardona Cert. ¶20; Def. SM's Ex. H-I, SM 26-27).  By way of further response, dozens of consumers have, over the years, filed complaints alleging that Vivint sales representatives have pulled their credit reports without consent. (Ex. 5, BBB 1–72).  These complaints include consumers from Florida, whose inquiries were made by Mosaic. (Id. at 49–56, 61–63, 68).  Jane Driggs of the Utah BBB has testified that all these complaints were transmitted to Vivint and processed by the company,

---

[2]     Of course, the inference to which Plaintiffs are entitled here at summary judgment is not that there was a mere lack of "training" on proper credit procedures, but that the Defendants' business model was either to turn a blind eye to the impermissible credit pulls or worse still, to train their salesmen to get credit reports regardless of consent or interest in the product.

indicating the company was put on notice of a systemic problem among their sales staff.  (Ex. 6, Driggs Dep. 14:01–10).

8.      Denied.   In the BBB correspondence, Ms. Cardona says "I will accept the response [from Vivint] once the credit bureaus remove the inquiries of my credit file." (Ex. 2, Cardona Cert. at Ex. B thereto, the BBB correspondence, at VS 0004–7).  Defendants never did so.  She had no option but to sue defendants.  Only after Defendants were sued did they seek removal of the inquiry.  (See ¶ 7, *supra*).

9.      Denied.  Martins expressly said he would <u>not</u> pull credit.  Moreover, Ms. Cardona told him several times in their conversation "not to check my credit." (Ex. 2, Cardona Cert. ¶¶4–6; Ex. 18, Cardona Dep. 55:08-56:05).  Martins has been accused of the same exact conduct on at least one other occasion. (Ex. 20, SM 428-430).  He likely learned these tactics from his manager and trainer, Briant Katilus, who was also alleged to have committed impermissible credit pulls and other violations of ethics standards. (Id. at 437).  Credibility is a jury issue.

10.     Admitted, but immaterial.

11.     Denied.   Ms. Cardona was actively looking to buy a new roof, not solar. Furthermore, she planned on paying cash. (Ex. 18, Cardona Dep. 45:22-46:01, 67:08-71:16). Vivint's cold-call was unexpected and unplanned. Credibility and causation are fact-based inquiries for the jury.

12.     Denied.   Ms. Cardona was actively looking to buy a new roof, not solar. Furthermore, she planned on paying cash.  Nonetheless, she did authorize a roofing company to run her credit. (Ex. 18, Cardona Dep. 45:22-46:01, 67:08-71:16).   Vivint's cold-call was unexpected and unplanned.  Credibility and causation are fact-based inquiries for the jury.

13.     Admitted upon information and belief, but immaterial.   By way of further response, Ms. Cardona never had solar panels installed. (Id.).

14.     Denied.   In addition to the out of pocket losses recognized by Defendants, Ms. Cardona suffered emotional distress damages compensable under the FCRA.   Per Ms. Cardona: "I feel violated by the defendants, that my privacy was invaded, fearful that my identity had been stolen, worried that a stranger can and did obtain my private information, angered that Defendants illicitly obtained and viewed my private information, and angry that Defendants fraudulently represented that they had my permission to get my credit report…. These feelings Vivint and Solar Mosaic gave me cause me to feel my heart race, have given me sleeplessness with worry, and has aggravated stomach and digestive problems I have due to my nervousness over it." (Ex. 2, Cardona Cert. ¶¶21-23; Ex. 18, Cardona Dep. 34:19-36:16, 86-96).   Ms. Cardona's husband corroborates her testimony. (Ex. 8, Yenque Cert.).

**Plaintiff Jerard Brown's Claims**

15.     Admitted that Coan is a door-to-door salesman who made an unexpected "cold-call" to Mr. Brown's home to pitch Defendants' solar products.   Mr. Brown listened to the sales pitch and provided a limited amount of information with the understanding that he "would not be obligated to anything." (Ex. 10 to Def. VS's MSJ, Brown Answers to Interrogatories No. 3).   At no point was credit or financing discussed. (Id.).   At some point after this meeting, Mosaic ran Mr. Brown's credit. (Ex. 19, Brown Dep. 50:07-71:09).   To the extent not admitted, this averment is denied.

16.     Admitted.   By way of further response, the PCCF is a forgery. (Ex. 1, Brown Cert. ¶¶5-9; Ex. 19, Brown Dep. 62:06-67:14).   See also ¶6, above.

17.   Admitted that Jerard Brown submitted a BBB complaint.  The rest is denied. Mosaic only "suppressed" the inquiries, turning them into "soft" inquiries after the passage of several months.  That inquiry was still visible on Brown's credit reports for a long time, "reminding me every time I saw it that these people stole my private information and still have it." (Ex. 1, Brown Cert. ¶16).  See also ¶7, above.

18.   Denied.  Mr. Brown was expressly <u>dissatisfied</u> with the resolution offered by Vivint in the BBB correspondence, stating: "I am rejecting [Vivint's] response". (See Ex. 1, Brown Cert. at Ex. A thereto, BBB complaint; Ex. 19, Brown Dep. 144:25-170:19).

19.   Denied.  Coan said nothing about credit, Brown never saw or touched the iPad, never saw or signed any PCCF form, and his signature on the PCCF is forged. See ¶¶15–16. Mitchell Coan had been accused of similar conduct by other consumers.  Mosaic communicated to Vivint that Coan had been accused of running credit without consent on at least 2 other occasions. (SM 477-79, 627-29).  One of these occurred in May 2017, four months before he forged Jerard Brown's signature and pulled his credit report. (SM 477-79).  At his prior employer, Vivint, Inc. (VS's affiliate company that sells home security systems), Mr. Coan was associated with 22 unique accounts where there was an allegation of forgery. (Ex. 8, Vivint, Inc. (C. Hymas) Dep. 30:10-49:05).

20.   Admitted there was a salesman in training at Brown's house that day.  The rest is denied.  During this litigation, Vivint identified the other salesman as Jacob Thebert.  Plaintiff attempted service of a subpoena on Mr. Thebert, but was unsuccessful. (Ex. 9, Aff't of Non-Service on Thebert).  At Coan's deposition, Plaintiff learned that Thebert was avoiding service of the subpoena after discussing this case via texts with Coan. (Def. VS's Ex. 3, Coan Dep. 180:17-191:03; Ex. 10 hereto, text messages that were Exhibit 5 to Coan Dep.).  Vivint (which first

adopted Thebert's text as some evidence supporting Coan's story), later changed its position after two additional complaints of impermissible pulls against Mr. Coan. (See Ex. 11, Vivint 13-15).  Thebert is hiding from Plaintiffs in this case and must be considered to have testimony adverse to Defendants' positions.

21.     Denied as stated. This is immaterial.

22.     Denied.   Mr. Brown suffered emotional distress damages compensable under the FCRA.  Per Mr. Brown: "I feel violated, that my privacy was invaded, fearful that my identity has been stolen, I am worried that a stranger can and did obtain my private information… These feelings of violation, anger and fear that Vivint and Solar Mosaic have given me cause my body to tense up, my heart to race, my fists to clench, and cause me to be tense and combative with the people around me." (Ex. 1, Brown Cert. ¶¶20-23; Ex. 19, Brown Dep. 42:09-44:05; 144:25-170:19).  His wife corroborates his testimony. (Ex. 12, Tyechia Brown Cert.).

**Vivint's Practice of Pulling Credit Reports without Consent**

23.     Denied.  In a door-to-door sale like we have in this case, the only way Mosaic is able to obtain a credit report is if an application is submitted through an installer partner, such as Vivint. (Def. VS's Ex. 7, SM Dep.(J. Smith) at 12:9-21:9, 83:11-84:11, 92:11-93:11).   In this case, it was Vivint's employees Coan and Martins that submitted information that allowed Mosaic to obtain credit reports. (See above).   Vivint is solely responsible for qualifying a consumer for the loan and purchase; there is no one from Mosaic with the Vivint representative when they are knocking on doors. (Def. VS Ex. 2, Martins Dep. 78:20-79:03).  Mosaic did not have a living, breathing presence on Plaintiffs' doorsteps and could not have applied for their credit reports without the actions of Vivint.  Vivint is "interfacing with consumers" on behalf of Mosaic.  "[Mosaic is] the ones that would give the consumer the loan amount to pay for the

panels." (Def. VS Ex. 15, Katilus Dep. 35:22-24). Vivint is in a contractual relationship with Mosaic which results in Vivint profiting by having installations funded by Mosaic loans for which Vivint agents complete applications (including credit authorizations). (Ex. 25, Vivint Contract and Amendments).

24.     Denied. Vivint used the Mosaic credit check to qualify consumers for their product: "once that application is submitted you'll get feedback from Mosaic right on the screen that tells the customer they've been approved for a loan… the customer also receives an email at that time letting them know they're qualified." (Ex. 14, Training Video, Vivint 000289 at 2:00-3:15). A green circle fills in on Vivint's iPad based platform alerting the Vivint salesman that this consumer is "qualified" for purchasing and installing panels. (Id.). If credit qualified, that means Vivint can get paid by Mosaic for the installation.

25.     Denied.  This "Ethics Standards" document (Def. Ex. 17) reads like an instruction manual for salespersons to commit fraud.  Whatever training is given is clearly insufficient as demonstrated by the volume of complaints of ethics violations related to impermissible credit pulls, forgery, creation of false accounts, creation of bogus email addresses, and consumer fraud, most of which followed implementation of this ethics standards document in December 2016. (See ¶6 above; Ex. 20, SM 309-698)

26.     Denied.  There is no record evidence that any of these so-called policies and procedures at Mosaic were ever communicated to the Vivint sales managers, like Martins and Coan, who were knocking on doors on Mosaic's behalf.   Whatever training is given is clearly insufficient as demonstrated by the volume of complaints of ethics violations related to impermissible credit pulls, forgery, creation of false accounts, creation of bogus email addresses,

and consumer fraud, most of which followed implementation of this ethics standards document in December 2016. (See ¶6; Ex. 20, SM 309-698)

27.     This speculation is denied.  Neither of the Plaintiffs gave the salesmen their social security numbers or a portion thereof. (Ex. 18, Cardona Dep. 51:09-53:06; Ex. 19, Brown Dep. 68:17-70:04).   Both Plaintiffs, in their contemporaneous BBB complaints, remark about how they were shocked that these companies can pull their credit reports without them having given social security numbers. (Ex. 2, Cardona Cert. ¶8 and BBB complaint attached thereto as Ex. A; Ex. 1, Brown Cert. ¶11 and BBB complaint attached thereto as Ex. A). Rather, Mosaic obtained the entirety of Plaintiff's social security numbers from the credit bureaus.  The credit bureaus Trans Union and Equifax attest that Mosaic does not submit last four digits of SSNs when requesting credit reports. (Ex. 13, Decl. of Trans Union ¶6; Ex. 24, Aff. of Elisa Lyons of Equifax ¶10).  When Jerard quipped that he couldn't believe his credit was pulled with just his name and address, a Mosaic representative admitted:

> Yeah, they don't need much to run credit if you even say that you're interested in solar or you want a quote. That gives them the authority to run your credit.   They already can pre-pull your information by almost like those preapprovals credit offers because they are targeting your area and they see who lives in the home and who owns the home and see initially if you will even qualify so if it is kind of a good lead though they will proceed forward and knock on your door. **So, they pretty much have information on you before they even get to the door**.

(Ex. 13, Call Transcript of 11/30/2017 phone call between Mosaic and Mr. Brown).  The Mosaic credit application used by Vivint representatives, and the training video accompanying it, calls for either the "birthday or last four digits of the social security number, whatever the customer is most comfortable with." (Ex. 14, Training Video, Vivint 000289 at 2:05-2:13).

III.    <u>ARGUMENT</u>[3]

### A.  Vivint used Plaintiffs' Consumer Reports Without a Permissible Purpose

In 1970, when Congress enacted the Fair Credit Reporting Act ("FCRA"), it did so "to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4); *accord Yang v. Gov't Employees Ins. Co.*, 146 F.3d 1320, 1322 (11th Cir. 1998).  To ensure the privacy of sensitive consumer information, Congress limited the availability of consumer credit reports— making them available only for certain specified purposes, stating that a "person shall not use or obtain a consumer report for any purposes unless . . . the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section[.]" 15 U.S.C. § 1681b(f); *TRW Inc. v. Andrews*, 534 U.S. 19, 23 (2001).

The FCRA narrowly circumscribes the purposes for which a person may obtain a credit report. See 15 U.S.C. § 1681b(a)(3) (listing exhaustively all purposes for which a person may obtain a credit report). *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1213 (11th Cir. 2019).  The FCRA requires either that the credit transaction be initiated by the consumer or the consumer authorize provision of the credit report. See 15 U.S.C. § 1681b(c)(1) & (c)(1)(A) (stating that a "consumer reporting agency may furnish a consumer report relating to any consumer pursuant to subparagraph (A) or (C) of subsection (a)(3) in connection with any credit . . . transaction that is not initiated by the consumer only if--(A) the consumer authorizes the agency to provide such report to such person").  Under no circumstances may a third party "troll for reports" or "request a report on a whim" without a permissible purpose. *Castro v. First Midwest Bancorp, Inc.*, 427 F.3d 1043, 1047 (7th Cir. 2005).

---

[3]     The Court is well familiar with the standard of review at summary judgment.  Nonetheless, Plaintiffs incorporate the standard in the Response in Opposition to the Motion for Summary Judgment filed by Defendant Mosaic filed contemporaneously herewith.

### i.      Vivint Used the Credit Reports

Here, Vivint claims that although its sales agent submitted Mosaic's consumer credit report request for the purpose of determining Plaintiffs' eligibility for buying Vivint's solar panels, it did not "use" Plaintiffs' credit reports.  Vivint's argument hinges on what Congress meant when it stated that a "person shall not use or obtain a consumer report for any [impermissible] purposes[.]" 15 U.S.C. § 1681b(f).

As with all issues of statutory construction, the inquiry begins with the plain text of the statute. *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1190 (11th Cir. 2019).  Congress's decision to prohibit both the "use" and "obtain[ing]" of consumer reports demonstrates that a person could be liable under § 1681b(f) for using a consumer report even if that person never *obtained* the report.  Although Vivint did not directly obtain Plaintiffs' consumer reports (despite being instrumental in doing so), it most certainly *used* those reports to determine whether Plaintiffs were credit eligible with Mosaic, and thus proper candidates for Vivint's solar panel system. (Oppo to VS facts ¶24; Ex. 3, VS Dep.(E. Pack) 22:05–20, 26:01–27:01, 30:01–04, 36:17–38:03, 201:11–24).

The ordinary definition of "use" demonstrates that Congress intended to capture Vivint's conduct.  *See Regions Bank*, 936 F.3d at 1190 ("statutory terms are generally interpreted in accordance with their ordinary meaning").  Black's Law Dictionary defines "use" as "[t]o employ for the accomplishment of a purpose." USE, BLACK'S LAW DICTIONARY (11th ed. 2019).  Merriam Webster similarly defines "use" as "the act or practice of employing something." USE, MERRIAM WEBSTER, https://www.merriam-webster.com/dictionary/use (last accessed Feb. 18, 2020).  Applying those definition here, Vivint plainly employed – that is, used – Plaintiffs' consumer reports for the purpose of "qualifying" a consumer to make a sale.

This ordinary construction of "use" is supported by case law construing the related term "user."  For example, in *Boothe*, the court explained that "[t]he term 'user' refers not only to the ultimate destination of a credit report but also encompasses the person *who acquires it for another*." *Boothe v. TRW Credit Data*, 557 F. Supp. 66, 71 (S.D.N.Y. 1982) (emphasis added).[4] In *Hansen*, the court of appeals held a store owner liable as a "user" where the store obtained a credit report on a congressional candidate on behalf of the candidate's political opponents. *Hansen v. Morgan*, 582 F.2d 1214, 1220 (9th Cir. 1978); *accord Kodrick v. Ferguson*, 54 F. Supp. 2d 788, 792 (N.D. Ill. 1999) ("In *Hansen*, the court established the rule that the term 'user' refers not only to the ultimate destination of a credit report but also encompasses the person who acquires it for another."); *see also Northrop*, 134 F.3d at 49 ("In situations where one person obtains a credit report for the use of another, moreover, the term 'user' includes the ultimate destination of a credit report as well as the person who acquires [a credit report] for another." (quotation marks omitted)).

In *Yohay*, a credit union employee obtained a credit report on Yohay for the purpose of forwarding it to Yohay's ex-wife—the credit union's attorney who was in a custody battle with Yohay. *Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967, 973 (4th Cir. 1987).  The Fourth Circuit held that the ex-wife/attorney was liable as a user, as the term "user" includes "the ultimate destination of a credit report" as well as "the person who acquires [a credit report] for another." *Id.*

---

[4]    *Boothe* and the other cases cited in this and the following paragraph involved a pre-amendment version of the FCRA that originally limited liability for "willful" violations to "[a]ny consumer reporting agency or **user** of information[.]" *Boothe*, 557 F. Supp. at 71 (quoting 15 U.S.C. § 1681n) (emphasis added).  Congress has since amended this provision to apply not just to users, but more broadly to "[a]ny person." 15 U.S.C. § 1681n(a); *accord Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 48 n.9 (2d Cir. 1997).

Vivint's argument that it did not "use" the credit report relies heavily on a North Carolina intermediate state court case, *Hageman v. Twin City Chrysler-Plymouth, Inc.*, 369 S.E.2d 99 (N.C. App. 1988).  (Def. br. at 10).  In that case, the court concluded—without citation to any authorities—that "[a] '**user**' is one who **obtains** consumer credit information from a consumer reporting agency for the purpose of making some determination[.]" *Id.* at 101 (emphasis).  While this case does not speak directly to the definition of "use," the court's cramped reading of "user" as one who "obtains" cannot square with the plain language of the statute as presently written, which applies to those who <u>"use" or "obtain."</u> 15 U.S.C. § 1681b(f).  If *Hageman*'s *ipse dixit* carried the day, the word "use" would be synonymous with "obtain," rendering the two separate prohibitions redundant—a result inconsistent with settled principles of statutory construction.  *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2520 (2015) ("[T]he Court will avoid a reading which renders some words altogether redundant").

Both Vivint and the court in *Hageman* also rely on *Rush v. Macy's New York, Inc.*, 775 F.2d 1554 (11th Cir. 1985), which presents a wholly different earlier version of the FCRA and equally distinguishable facts. In *Rush*, the court held that Macy's could not be held liable under the pre-amendment FCRA as a "user" for its conduct as a furnisher of inaccurate credit information to a consumer reporting agency.  That fact pattern differs substantially from the facts in this case, where Vivint's salesmen were instrumental in getting a report which Vivint used to determine Plaintiffs' credit eligibility for the purpose of making a sale.

Further, "[i]n 1996, Congress amended the FCRA to impose duties upon persons who furnish information to credit reporting agencies." *Riley v. Gen. Motors Acceptance Corp.*, 226 F. Supp. 2d 1316, 1319 (S.D. Ala. 2002) (citing 15 U.S.C. § 1681s–2). "Prior to these

amendments, the FCRA did not impose any duties on those furnishing information to credit reporting agencies." *Id.*; *accord Blumenfeld v. Regions Bank*, 2018 WL 4216369, at *5 (N.D. Ala. Sept. 5, 2018) ("nonsensical" to rely on earlier version of FCRA, rejecting application of "reason to believe" standard applicable to the CRAs to users of credit reports).

Finally, as explained previously, the FCRA was also amended to expand liability not just to "credit reporting agencies" and "users," but to "any person[.]" *Northrop*, 134 F.3d at 48 n.9. In quoting *Rush* on pages 9 and 10 of its brief, Vivint fails to direct this to the Court's attention. There is ample evidence in the record that Vivint used Plaintiffs' consumer reports, and Vivint cannot establish that it independently had a permissible purpose for doing so.  Vivint's motion for summary judgment must be denied.

### B.  Vivint and Mosaic Used and Obtained Plaintiffs' Consumer Reports Without a Permissible Purpose

The arguments made by Vivint at pages 11-13 of its brief are addressed in Plaintiffs opposition to Mosaic's motion at Sections III.B, which is incorporated here by reference.

### C.  Plaintiffs are Entitled to their Actual Damages for Emotional Distress

The arguments made by Vivint at pages 13-15 of its brief are addressed in Plaintiffs opposition to Mosaic's motion at Section III.E, which is incorporated here by reference.

### D.  Vivint Willfully Violated the FCRA

The FCRA prohibits both willful and negligent violations. 15 U.S.C. §§ 1681n, 1681o. "Willfulness is typically a question of fact for the jury." *Hargrett v. Amazon.com DEDC LLC*, 235 F. Supp. 3d 1320, 1327 (M.D. Fla. 2017) (*citing Miller v. Johnson & Johnson*, 80 F. Supp. 3d 1284, 1296 (M.D. Fla. 2015)).

In 2007, the Supreme Court "lowered the bar for what constitutes willful noncompliance," stating that it includes both knowing and reckless violations. *Slantis v. Capozzi*

& *Assocs., P.C.*, 2010 WL 4878846, at \*4 (M.D. Pa. Aug. 10, 2010) (*citing Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56–57 (2007)).   A defendant can willfully violate the FCRA by adopting policies or procedures with reckless disregard as to whether they would result in FCRA violations. *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1307 (11th Cir. 2016) (holding "[a] reasonable jury could find that Midland adopted such a system with reckless disregard for the fact that it would result in perfunctory review in contravention of the FCRA"); *Cortez v. Trans Union, LLC*, 617 F.3d 688, 721 (3d Cir. 2010) (willful violation "by adopting a policy with reckless disregard of whether it contravenes a plaintiff's rights under the FCRA"). In FCRA cases, evidence of intentional trickery, or of repeated misconduct suspected of being unlawful "would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dixon-Rollins v. Experian Info. Sols., Inc.*, 753 F. Supp. 2d 452, 465 (E.D. Pa. 2010) (upholding willfulness verdict).

The willfulness inquiry can also look at whether "the conduct involved repeated actions or was an isolated incident." *Menefee v. Choicepoint, Inc.*, No. 08-981, 2009 WL 174134, \*4 (E.D. Pa. Jan. 26, 2009).  Willfulness violations occur where the defendant, *inter alia*, fails to adopt appropriate procedures, furnishes reports without the consent of the consumers, obtains and furnishes reports under false pretenses, uses bogus names and false reasons, or uses deceit and false pretenses. *See, e.g.*, *Hall v. Harleysville Ins. Co.*, 896 F. Supp. 478, 483 (E.D. Pa. 1995) (impermissible pull case, denying summary judgement).  This record demonstrates an abundance of all this evidence.

Vivint was on notice that both Mitchell Coan and Ricardo Martins were repeat offenders, having been accused of impermissible pulls on other occasions. (Oppo to VS facts ¶¶9, 19). Vivint adulterated Ms. Cardona's email address, ensuring that Ms. Cardona would not see a copy

of the forged PCCF. (Oppo to VS facts ¶6).  A Vivint salesman in New Jersey admitted that this practice was intended to prevent the consumer from receiving notice of important documents in their name. (Id.).

Even before the salesmen visited Plaintiffs, Vivint had notice of fraud, forgery, and impermissible credit pulls on multiple occasions in the months preceding the incidents in this case, including a veteran who alleged his credit was pulled while he was on active duty in Afghanistan. (Id.).  Since 2013, dozens of consumers lodged BBB complaints against Vivint, putting it on notice of a systemic problem among their sales staff. (Id. ¶7).  In January 2017, Mosaic notified Vivint of the "systemic issue" concerning violations of "federal and state privacy laws with respect to credit inquiries," stating "it's already big, I'm trying to stop it from getting bigger." (Ex. 28, SM-Vivint Communications, SM 794).  A former Vivint employee who used to field and resolve complaints confirmed that instead of investigating the numerous complaints of impermissible pulls, Vivint swept these complaints "under the rug." (Ex. 32, Baumgarten Dep. 52:06–55:23).  Despite being notified repeatedly that their training was inadequate, Vivint continued to give salesmen access to powerful tools that enabled them to invade consumer privacy. (Oppo to VS facts ¶6).  The PCCF document itself and the decision to use it present substantial evidence of Defendant's willful violation of the FCRA.  The form itself can be easily forged, making it hopelessly defective, as any observer—let alone a sophisticated corporation—can conclude on their own. (Id.).

Vivint certainly knows about its legal obligations under the FCRA.  As far back as 2013, Vivint maintained agreements with the credit reporting agencies, which demonstrate that Vivint has known for years about its obligation to only pull credit for a permissible purpose. (Ex. 31, Vivint Subscriber Agreements at 84, 116, 121–23).  Vivint's Customer Operations Manual from

August 2016 confirms that Vivint was long on notice of its obligations under the Fair Credit Reporting Act. (Ex. 30, Vivint 2016 Customer Operations Manual).

All the above is evidence of willfulness. *See Hinkle*, 827 F.3d at 1307; *Cortez*, 617 F.3d at 721; *Dixon-Rollins*, 753 F. Supp. 2d at 465; *Menefee*, 2009 WL 174134, at *4; *Hall*, 896 F. Supp. at 483.  Summary judgment must be denied.

### E.  Plaintiffs' Declaratory Count Must Stand

Vivint argues Plaintiffs are not entitled to equitable relief under the Declaratory Judgment Act under Ch. 86, Florida Statutes, due to the purported lack of a justiciable question for which the plaintiff is in doubt, and the purported lack of need for a declaration.  In support, Vivint relies solely upon Plaintiffs' allegations in the Complaint pleading violations of the FCRA.   But Vivint's argument is meritless, as it is entirely appropriate at the pleading stage to allege inconsistent facts or alternative claims. Fed.R.Civ.P. 8(d)(2)–(3); Fla.R.Civ.P. Rule 1.110(g). Eliminating Plaintiffs' right to declaratory relief merely because they exercised their rights to plead alternative claims and facts would be antithetical to the rules of pleading and the remedial purpose of the Florida Declaratory Judgment Act, which must be "liberally administered and construed." *Allstate Ins. Co. v. Conde*, 595 So.2d 1005, 1007 (Fla. 5th DCA 1992).

Further, Plaintiffs' claims for declaratory relief are necessary (and not duplicative) because a jury could theoretically find no negligence or willfulness, which is a prerequisite to a civil suit for damages. 15 U.S.C. §§ 1681n, 1681o.  Nonetheless, the Court could still conclude that Defendants used or obtained Plaintiffs' credit reports for an impermissible purpose, 15 U.S.C. § 1681b(f), and enter a declaratory judgment on the same.

**F.  Vivint Solar, Inc. is subject to the same liability as Vivint Solar Developer, LLC**

Incredibly, Vivint contends that Vivint Solar, Inc. is not liable for the conduct of its sales agents.  In fact, Vivint claims that "Vivint Solar, Inc. is merely the parent company of Vivint Solar Developer, LLC—the company that actually sold solar panels in Florida and employed the salespersons who interacted with Plaintiffs[.]" (Def.'s Br. at p. 21).

This argument is meritless because the record shows a direct employment relationship, which is confirmed by Vivint Solar, Inc.'s admissions.  Mitchell Coan's and Ricardo Martins' employment agreements state "Vivint Solar, Inc. its subsidiaries, or affiliates [collectively referred to as 'Vivint Solar', the '**Company**' or 'we'] is pleased to offer you the position of C1004 - Solar Sales Manager, reporting to . . . Vivint Solar, Inc." (Ex. 27, VS 20, 47) (brackets in original, emphasis added).  The employment agreements make it abundantly clear to these salesmen that their "employment with the **Company** is for no specific period of time and is 'at will,' meaning that either you or the **Company** may terminate your employment at any time and for any reason, with or without notice or cause." (*Id.* (emphasis added)).

Vivint Solar, Inc.'s SEC filings confirm its employment relationship with its "direct-selling" (i.e. door-to-door) sales force.  In those filings, Vivint Solar, Inc. admits:

> The success of our direct-selling channel efforts depends upon the recruitment, retention and motivation of a large number of sales personnel to compensate for a high turnover rate among sales personnel, which is a common characteristic of a direct-selling business. In order to grow our business, we need to recruit, train and retain sales personnel on a continuing basis."

(SEC Form 10-K, Annual Report for fiscal year 2017 at p. 17;[5] *see also id.* ("We deploy our direct-to-home sales force to provide in-person professional consultations to prospective

---

[5]     This filing is a matter of public record, available at https://www.sec.gov/Archives/edgar/data/1607716/000156459018004717/vslr-10k_20171231.htm.  The Court may

customers to evaluate the feasibility of installing a solar energy system at their residence."); *id.* at

p. 4 ("The members of our sales force typically reside and work within the markets they

serve.")).  What's more, Vivint Solar, Inc. candidly admits its responsibility to train its sales

force to comply with the law. (*Id.* at p. 17 ("If additional laws affecting direct sales and

marketing are passed in the markets in which we operate, it would take time to train our sales

force to comply with such laws, and we may be exposed to fines or other penalties for violations

of such laws.")).

It is "well settled that personal participation by a corporate employee, officer, or director

in the wrongful activities of a corporation is sufficient to make the individual, as well as

the corporation, substantively liable for a tort." *Delong Equip. Co. v. Washington Mills Abrasive

Co.*, 840 F.2d 843, 851 (11th Cir. 1988).  Accordingly, Vivint Solar, Inc. cannot now complain

that it is not liable for the torts of its admitted sales agents, Coan and Martins.

## IV.   <u>CONCLUSION</u>

For all the reasons set forth in this brief and the substantial record of systemic and

pervasive consumer fraud in willful violation of the FCRA, Defendant's Motion for Summary

Judgment must be denied.

Respectfully submitted:

Date: <u>February 18, 2020</u>                     <u>*/s/ Andrew M. Milz*                     </u>

ANDREW M. MILZ
JODY T. LOPEZ-JACOBS
*Admitted pro hac vice*

FLITTER MILZ, P.C.
450 N. Narberth Avenue, Suite 101
Narberth, PA 19072
(610) 822-0782 (ph)

---

take judicial notice of SEC filings. *See, e.g.*, *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999). The Court may take judicial notice of the SEC filings under Fed. R. Evid. 201(b)(1) and (2).

(610) 667-0552 (fax)
amilz@consumerslaw.com

CRAIG E. ROTHBURD
FBN: 0049182
320 W. Kennedy Blvd., #700
Tampa, Florida   33606
(813) 251-8800 (ph)
(813) 251-5042 (fax)
crothburd@e-rlaw.com
mropp@e-rlaw.com

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 18, 2020, the foregoing was filed with the Clerk of the Court

using the CM/ECF system, which will send a notice of electronic filing to counsel of record.



*/s/ Andrew M. Milz*
CARY L. FLITTER
ANDREW M. MILZ
JODY THOMAS LÓPEZ-JACOBS

FLITTER MILZ, P.C.
450 N. Narberth Avenue, Suite 101
Narberth, PA 19072
(610) 822-0782

**ATTORNEYS FOR PLAINTIFFS**