**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| ELIZABETH CARDONA and | : | |
| JERARD BROWN, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CASE NO.:   18-cv-02838-SCB-JSS |
| | : | |
| VIVINT SOLAR, INC., | : | |
| VIVINT SOLAR DEVELOPER, LLC, and | : | |
| SOLAR MOSAIC, INC., | : | |
| Defendants. | : | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**DEFENDANT SOLAR MOSAIC, INC.'S MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION

Solar Mosaic is an indirect finance company that "partners" with a door-to-door sales company called Vivint to fund the installation of solar panels.  Mosaic relies entirely on Vivint and other installers to bring the financer into the transaction – the two companies use an integrated iPad software platform and integrated forms to pull consumer credit reports to "qualify" homes for solar purchasers.  Mosaic obtains the full credit report from the credit bureaus, and Vivint uses it to qualify a home for its product so it can get paid.

Plaintiffs Elizabeth Cardona (of Orlando) and Jerard Brown (of Valrico) had their signatures forged by different Vivint salesmen on "credit consent forms" and their credit reports pulled without consent by Solar Mosaic on different days, in different parts of Florida.  Solar Mosaic **admits** these consumers "did not knowingly apply for the loan application with Solar Mosaic nor did the consumer give authorization to run their credit." (Exs. 22-23).

Plaintiffs' stories are not unique.  Since at least 2016, the symbiotic relationship between Mosaic and Vivint has been rife with fraud, forgery, and unauthorized credit pulls.  Mosaic has

known about those problems, but failed to take any meaningful actions to stop them. In fact, Mosaic's records show that it confirmed multiple instances of fraud by Vivint. (*See, e.g.*, Ex. 20, SM[1] 309-698; at 383 ("No contest has been received from Vivint so this is being resolved as a confirmed case of Fraud."); *id.* at 373 ("closing this as confirmed fraud due to the lack of notification of homeowner on credit pull"). In a call recording, a Mosaic agent admits, "We've had a rash of these [impermissible pulls] with Vivint customers in Florida. I don't know what it is about their team in Florida that is causing this." (Ex. 16, SM 300).

Now, both Defendants argue that neither is liable for the forgery and FCRA violations they have known about for years. Both take narrow and incorrect readings of the remedial FCRA and argue Plaintiffs have no claims. Both are wrong, as set forth herein.

## II.   **FACTS**

Facts set forth in Mosaic's brief (pp. 3-7) are admitted unless indicated otherwise below:

1.      Plaintiffs deny that Mosaic "exercises little or no direct control" over the behavior of the sales staff of its "sales partner," Vivint. (Def. br. at p. 4). Mosaic cannot get involved in a deal unless the Vivint sales representative knocks on a door, opens the credit application, and submits it through a Vivint's salesman's iPad. (Def. VS's Ex. 7, SM Dep. (J. Smith) 12:9-21:9, 83:11-84:11, 92:11-93:11).

There is an agreement between the two companies whereby each benefits from the relationship. (Id). Mosaic authorized Vivint to use Mosaic's loan products through Vivint's specialized NEO platform. (Ex. 3, VS Dep. (E. Pack) 36:17–38:03). Vivint's NEO platform is specially designed to be integrated with Mosaic, so that all of the relevant data capture by Vivint

---

[1]      Documents produced by Solar Mosaic with the bates label reading "Solar Mosaic_Cardona-Brown" are referred to herein by the abbreviation "SM." At times, Plaintiffs incorporate their opposition to the lengthier statement of facts set forth in Vivint Solar's motion for summary judgment. Plaintiff refers to those facts as "Oppo to VS facts."

is integrated into Mosaic's credit application process. (Ex. 17, SM Dep. (N. Brignole) 13:22–14:15). Mosaic permits Vivint's salespersons to view Mosaic's credit application on their iPad. (Id. at p. 16:20–17:02).

Mosaic notifies Vivint of instances where consumers complain of fraud by their mutual salesmen. (Id.). On December 13, 2019, after two court orders compelling the same, Mosaic turned over 8 hours of voice recorded complaints about Vivint sales agents pulling credit without consent, as well as nearly 400 pages of documented complaints, some of which it sent to Vivint. In one of those recordings, the Mosaic agent admits, "We've had a rash of these [impermissible pulls] with Vivint customers in Florida. I don't know what it is about their team in Florida that is causing this." (Ex. 16, SM 300; see also Ex. 20).

2.      Plaintiffs deny that a "customer submits an electronic credit application." (Def. br. at p. 4). Cardona and Brown never touched an iPad, saw or completed an application, nor submitted anything. Neither had ever heard of Mosaic. (Oppo to VS facts ¶¶6, 16). This is echoed in dozens of similar complaints by Florida consumers, who realized belatedly that Mosaic pulled their credit without consent. (Id).

3.      Plaintiffs deny that "Cardona and Brown (or someone acting in their names) applied for loans." (Def. br. at p. 5-6). Mosaic admits these consumers "did not knowingly apply for the loan application with Solar Mosaic nor did the consumer give authorization to run their credit." (Exs. 22-23). Neither Plaintiff reviewed nor touched an iPad at all, let alone a credit application. Neither had ever heard of Mosaic. (See ¶2, *supra*; see also Oppo to VS facts ¶¶6, 9, 15-16, 19).

4.     Plaintiffs deny an email was sent to Ms. Cardona. (Def. br. at p. 6).  This is because the Vivint salesman Ricardo Martins deliberately inputted a bogus email address into his iPad. (Oppo to VS facts ¶6).

## III.   ARGUMENT

### A. Summary Judgment Must be Denied on this Extensive Record of Forgery, Corporate Encouragement of Fraud, and Willful Disregard for the Law

At summary judgment the Court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor," and "may not weigh conflicting evidence or make credibility determinations of its own." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016). "[I]n cases in which willfulness is an issue, 'summary judgment should be granted with caution, since questions such as intent or motive are presented." *Hammer v. Slater*, 20 F.3d 1137, 1144 (11th Cir. 1994).  This case has many unresolved fact disputes, and questions as to Defendant's motives and credibility, making it ill-suited for summary judgment. *Wate v. Kubler*, 839 F.3d 1012, 1018, 1021 (11th Cir. 2016).

### B. Mosaic Obtained and Used Plaintiffs' Consumer Reports Without a Permissible Purpose

In 1970, when Congress enacted the Fair Credit Reporting Act ("FCRA"), it did so "to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4); *Yang v. Gov't Employees Ins. Co.*, 146 F.3d 1320, 1322 (11th Cir. 1998).  To ensure the privacy of sensitive consumer information, Congress limited the availability of consumer credit reports— making them available only for certain specified purposes, stating that a "person shall not use or obtain a consumer report for any purposes unless . . . the consumer report is obtained for a

purpose for which the consumer report is authorized to be furnished under this section[.]" 15 U.S.C. § 1681b(f); *TRW Inc. v. Andrews*, 534 U.S. 19, 23 (2001).

The FCRA narrowly circumscribes the purposes for which a person may obtain a credit report. *See* 15 U.S.C. § 1681b(a)(3) (listing exhaustively all purposes for which a person may obtain a credit report); *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1213 (11th Cir. 2019). Simply put, the FCRA requires either that the credit transaction be initiated by the consumer or that the consumer authorize the provision of the credit report. See 15 U.S.C. § 1681b(c)(1) & (c)(1)(A) (stating that a "consumer reporting agency may furnish a consumer report relating to any consumer pursuant to subparagraph (A) or (C) of subsection (a)(3) in connection with any credit . . . transaction that is not initiated by the consumer only if--(A) the consumer authorizes the agency to provide such report to such person"). A third party may not "troll for reports" or "request a report on a whim" without a permissible purpose. *Castro v. First Midwest Bancorp, Inc.*, 427 F.3d 1043, 1047 (7th Cir. 2005).

Mosaic <u>admitted</u> to the credit bureaus that it did not have a legal basis to run Plaintiffs credit. (Ex. 22 and 23). Plaintiffs' credit reports were obtained through fraud and forgery, in door-to-door cold-calls that were in no way initiated by the consumers. (Oppo to VS facts ¶¶6, 9, 15-16, 19). There is clearly no permissible purpose under the Act for such conduct. Nonetheless, Mosaic throws a whole host of theoretical "permissible purposes" against the wall. None of them stick. Mosaic further contends that it only needs a "reasonable belief" that one of the permissible purposes existed. This is not the standard, but in any event, Defendants had no reasonable belief that Plaintiffs consented to the credit pulls or initiated a transaction with Defendants because Vivint's salesmen fraudulently initiated the transaction, and their fraud is imputed to the principal, Mosaic.

### i.  No consent – Defendants forged Plaintiffs' signatures on the PCCFs

Mosaic's first claimed permissible purpose is that it "intend[ed] to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." (Mosaic Br. at p. 9).  Mosaic glosses over the fundamental requirement that attaches to this claimed permissible purpose—**that the consumer either initiate the transaction or consent to the credit pull.** 15 U.S.C. § 1681b(c)(1).  Neither of those apply here.  Plaintiffs steadfastly deny providing any such consent. (Ex. 2, Cardona Cert. ¶¶1–13; Ex. 1, Brown Cert. ¶¶1–8, 17–19; Ex. 18, Cardona Dep. at pp. 45:14-60:02; Ex. 19, Brown Dep. at pp. 50:07-71:09). Indeed, discovery has revealed that Vivint's salesmen *forged* Plaintiffs' signatures on easily manipulable "Prospective Customer Consent Forms" ("PCCFs"). (Oppo to VS facts ¶¶6, 16). Consent simply cannot be claimed as a permissible purpose.

### ii.  Plaintiffs did not initiate any transaction, and Defendants knew it

For a transaction to be "initiated by the consumer," there must be a "direct link" between the consumer's search for credit and the request for a credit report. *Castro*, 427 F.3d at 1047. Courts around the country have held that a transaction is not initiated by the consumer even when the consumer is "essentially window shopping," or "comparison shopping."  Here, Plaintiffs had no interest in Defendants' cold call to their homes.

In *Boone v. T-Mobile USA Inc.*, 2018 WL 588927 (D.N.J. Jan. 29, 2018), the consumer alleged that he made a "general inquiry about the availability of cell phone plans and rates," stated his preference that he did not want a hard credit inquiry, and "never signed any agreement and never agreed to any services from" the defendant. *Id.* at *14.  The district court held that these actions "do not amount to a 'business transaction . . . initiated by the consumer.'" *Id.*  The

court found support for this uncontroversial conclusion in a 1998 Advisory Opinion of the Federal Trade Commission addressing the extent to which a consumer "initiates" a business transaction when making inquiries at a car dealership. *See id.* (*citing* FTC Advisory Opinion on the Fair Credit Reporting Act, 1998 WL 34323748, at *1 (Feb. 11, 1998) [hereinafter "FTC Opinion"]).[2]

The FTC Opinion states that as a general matter, a consumer's "request for general information about products and prices offered does not involve a business transaction initiated by the consumer." *Id.* This holds true when a consumer asks a car dealer questions about pricing and financing, because such questions do "not necessarily indicat[e] an intent to purchase or lease a vehicle from that particular dealer." *Id.* The FTC explained that a dealer may obtain a consumer report without the consumer's permission "[o]nly in those circumstances where it is *clear* both to the consumer and to the dealer that the consumer is actually initiating the purchase or lease of a specific vehicle[.]" FTC Opinion at p. 2 (emphasis added). The dealer's need for the information must be "directly related to the completion of the transaction. For example, a dealer may obtain a report, if one is necessary, in order to arrange financing requested by the consumer." *Id.* The FTC's consumer-oriented opinion is consistent with the remedial purposes of the FCRA. The FCRA is a remedial consumer protection statute, "and any interpretation of this remedial statute must reflect those objectives." *Bruce v. Homeward Residential, Inc.*, No. 14-3325, 2015 WL 5797846, at *10 n.3 (N.D. Ga. Aug. 31, 2015) (quoting *Cortez v. TransUnion, LLC*, 617 F.3d 688, 722 (3d Cir. 2010)).

---

[2]    This opinion letter is "entitled to respect" based on its "power to persuade," as such opinion letters "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift*, 323 U.S. 134, 140 (1944). Courts have found the FTC Opinion to be persuasive. *See, e.g.*, *Miller v. Dish Network, L.L.C.*, 326 F. Supp. 3d 51, 74 (E.D. Va. 2018) ("[T]he Court finds the FTC's guidance to be persuasive and adopts it here.").

Plaintiffs were not even window shopping.  Ms. Cardona told the Vivint salesman that she was not interested in a loan, and that she did not want her credit pulled. (Oppo to VS facts at ¶ 9).  Mr. Brown listened to the sales pitch and provided a limited amount of information with the understanding that he "would not be obligated to anything." (Oppo to VS facts ¶¶15, 19).  At no point was credit or financing discussed (*id.*), and it certainly not "clear" to all involved that Brown was "actually initiating" any transaction. *See* FTC Opinion at p. 2 (consumer initiates a transaction "[o]nly in those circumstances where it is clear both to the consumer and to the dealer that the consumer is actually initiating the purchase or lease of a specific vehicle").  Both consumers' signatures were *forged*. (Oppo to VS facts ¶¶6, 16).

### iii. Defendant's "Reasonable Belief" Standard Applies to the *Credit Bureaus*, not to *Users* of Consumer Reports Like Defendants

Despite Mosaic's admission of wrongdoing, Defendants rely on an outdated and unpublished 1997 case from the Fourth Circuit (and its flawed progeny) for the proposition that the company only needed to have a "reasonable belief" that it had a permissible purpose.  As set forth below, under the plain statutory language, "reasonable belief" is not the standard for users of credit reports like Defendants.  But, even if that standard should apply to users of reports in some situations, there is no way Defendants had any rational or articulable belief, let alone a "reasonable" one, that Plaintiffs consented to the credit pulls or initiated a transaction.

### 1. The statute is clear: "users" like Defendants must have a permissible purpose, not just some vague belief that they do

The FCRA uses a number of terms to refer to the parties involved in the creation, use of, and access to consumer reports.  A "consumer reporting agency" ("CRA") is any party that, "for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on

consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). The largest are Equifax, Experian and Trans Union.  Neither Vivint nor Mosaic is a CRA; they are "persons" as defined by the FCRA. *Id.* § 1681a(b).

Congress addressed the requirements of § 1681b(a) only to CRAs: "Subject to subsection (c) of this section [inapplicable here], any consumer reporting agency may furnish a consumer report under the following circumstances and no other.").  Specifically, subsection (a) allows the credit reporting agency to provide a credit report "[t]o a person which *it* has *reason to believe* ... (F) otherwise has a legitimate business need for the information." § 1681b(a)(3)(F) (emphasis added). The statute requires that the <u>CRA</u> (antecedent of the third person singular pronoun "it") have "reason to believe" the "person" (i.e. the "user") to which it provides a credit report "has a legitimate business need for the information." *See Cappetta v. GC Servs. Ltd. P'ship*, 654 F.Supp.2d 453, 459 (E.D. Va. 2009).

The statute itself, however, says nothing about the standard to which the relevant "user" must be held when certifying a permissible purpose.  *Id.*  Relying on *Korotki v. Thomas, Ronald & Cooper, P.A.*, 1997 WL 753322, at *2 (4th Cir. Sept. 29, 1997) and its progeny, SM appears to contend that 1681b(f) somehow incorporates (without reference) language from § 1681b(a) (permitting a <u>CRA</u> to furnish a report if it has "reason to believe" the <u>user</u> intends to use that information in certain ways), so that it can argue that it had some "reason to believe" it had a permissible purpose for pulling Plaintiffs' consumer reports.[3]  This argument does violence to Congress' plain statutory language, is nonsensical, has been rejected in the courts, and should be rejected here.

---

[3]      Mosaic buries the lead that *Korotki* first articulated the flawed analysis Mosaic pushes here.  In any event, Mosaic cites *Korotki* in a parenthetical on page 13 of its brief.

First, *Korotki* relied on an older version of the Act.  The FCRA was amended in 1996 to enact the substantively stricter requirements of § 1681b(f) that <u>users</u> have a "legitimate business need for the information <u>in connection with a business transaction involving the consumer</u>." *See Slantis v. Capozzi & Associates, P.C.*, 2010 WL 4878846, at \*3 (M.D. Pa. Aug. 10, 2010), *report and recommendation adopted*, 2010 WL 4853672 (M.D. Pa. Nov. 23, 2010) (emphasis added, refusing to follow *Korotki*); *accord Cappetta*, 654 F. Supp. 2d at 459 (same). The *Korotki* court "could not resort to the statutory language in subsection (f) because subsection (f) did not yet exist." *Blumenfeld v. Regions Bank*, 2018 WL 4216369, at \*5 (N.D. Ala. Sept. 5, 2018).  Despite surely knowing its standard for CRAs articulated in § 1681b(a), Congress said nothing in the amended sections about *users* needing only some "reasonable belief."  *Id.*

As recognized by Judge Axon of the N.D. Alabama in *Blumenfeld*, which recently addressed this very question, *Korotki's* application of the statutory text in light of the amended FCRA is "nonsensical." *Id.* "A user always *knows* the purpose for which it intends to use the information. Even if the user forms its purpose based on erroneous information—for example, in the case of an identity thief misrepresenting herself as a consumer, thereby causing the user to request a report on the individual it believes to be the consumer—the user knows the reason for its own request." *Id.* at \*5 (*citing Bickley v. Dish Network, LLC*, 751 F.3d 724, 731 (6th Cir. 2014)).  Per Mosaic's argument, a user need only have a reasonable belief that it is requesting a report for a permissible purpose.  Congress could not have intended for a user's subjective belief to trump the Act's strict requirement of a permissible purpose. The outdated *Korotki,* and the cases cited by Mosaic (on p. 13) that uncritically follow *Korotki*, are not persuasive.

A review of the district court cases cited on pages 13 and 14 and in footnotes 5 and 6 of Mosaic's brief reveals that they uncritically rely on *Korotki* and its progeny without giving due

consideration to the FCRA amendments that proceeded *Korotki*. Indeed, the plaintiffs in these cases—nearly all *pro se* litigants[4]—did not raise the issue.

Further, most of these cases involve distinct claimed permissible purposes, rendering them distinguishable.  For example, in the *pro se* case *Trikas*, the bank's purpose of pulling the plaintiff's credit report was "to review an *existing* customer's account" making it proper under § 1681b(a)(3)(A). 351 F. Supp. 2d at 43 (emphasis added).  Plaintiffs did not have an existing account with either Defendant.  The court in *Trikas* also improperly imported the "reason to believe" language—apparently not noticing the tautological fallacy of doing so.  *Id.* at 42 n.7.  In *James*, the "record here support[ed] Defendant's position that it obtained Plaintiff's consumer report *in order to determine whether the disputed debt was still reflected on the report*"—which is not a purpose claimed by Defendants. 2005 WL 1806501, at *3 (emphasis added).  Again, the court uncritically relied upon *Korotki*'s dated pronouncement. *Id.*

Mosaic also relies heavily on the unpublished *pro se* appeal in *Middlebrooks v. Sacor Fin., Inc.*, 775 F. App'x 594, 595 (11th Cir. 2019).  During the district court proceedings, which was rife with procedural irregularities, the litigious *pro se* plaintiff apparently did not argue that the "reasonable belief" standard does not apply.  Even if *arguendo* such an argument were timely made before the magistrate and district court below, the issue was certainly waived on appeal because it was not raised by the *pro se* appellant. (*See generally* Ex. 29, Middlebrooks Appellant's Brief). *United States v. Pilati*, 627 F.3d 1360, 1364 (11th Cir. 2010) ("when on appeal a defendant fails to raise an issue when the opportunity is presented, he waives that

---

[4]     The *pro se* cases relied upon include *Foote v. Cont'l Serv. Grp.*, No. 18-73, 2018 WL 3008880 (M.D. Fla. June 16, 2018), *Miller*, 326 F. Supp. 3d at 54, *Trikas v. Universal Card Servs. Corp.*, 351 F. Supp. 2d 37, 43 (E.D.N.Y. 2005), *Geiling v. Wirt Fin. Servs., Inc.*, No. 14-11027, 2014 WL 8473822 (E.D. Mich. Dec. 31, 2014), *Daniel v. Bluestem Brands, Inc.*, No. 13-11714, 2014 WL 81763 (E.D. Mich. Jan. 9, 2014), *Alston v. Cent. Credit Servs., Inc.*, No. 12-2711, 2013 WL 4543364 (D. Md. Aug. 26, 2013), *Kennedy v. Victoria's Secret Stores, Inc.*, No. 03-2691, 2004 WL 2186613 (E.D. La. Sept. 29, 2004), *Frazier v. RJM Acquisitions LLC*, No. 14-0047, 2015 WL 795078 (D. Md. Feb. 24, 2015), and *Bracken v. Fannie Mae Consumer Res. Ctr. Inc.*, No. 13-1983, 2014 WL 5527837 (D.S.C. Oct. 31, 2014).

argument"). Accordingly, the Eleventh Circuit was not in a position to address whether the "reasonable belief" standard was appropriate, as that argument had not been raised by the *pro se* appellant either in the proceedings below or on appeal.

To the extent an "innocent" user is deceived into pulling a consumer's credit report by a third party imposter for an impermissible purpose, the FCRA adequately protects innocent users by conditioning the right to sue on a showing of negligence or willfulness. *See* 15 U.S.C §§ 1681o, 1681n. In other words, "innocent" users are not held strictly liable for their otherwise unlawful conduct of pulling a credit report without a permissible purpose. The user must do so negligently or willfully as a precondition of suit. Accordingly, in *Blumenfeld*, the court denied summary judgment because there was enough evidence of a willful impermissible pull: "[A] jury could find that Regions Bank *knew* that the consumer had not initiated a transaction." 2018 WL 4216369, at *7 (emphasis in original). Section 1681b(f) does not incorporate the "reason to believe" language from § 1681b(a). *Id.* at *5. Defendants needed a permissible purpose.

### 2. *Arguendo,* Mosaic had no "reasonable belief" it had a permissible purpose

Mosaic could not reasonably believe that it had the permissible purpose that it now claims. For one, normal agency principles dictate that the fraud and knowledge of Vivint's salesmen are imputed to Mosaic—the principal who authorized Vivint to use Mosaic's loan products through Vivint's specialized NEO platform. (Ex. 3, VS Dep. (E. Pack) 36:17–38:03). Vivint's NEO platform is specially designed to be integrated with Mosaic, so that all of the relevant data capture by Vivint is integrated into Mosaic's credit application process. (Ex. 17, SM Dep. (N. Brignole) 13:22–14:15). Mosaic permits Vivint's salespersons to view Mosaic's credit application on their iPad. (Id. at p. 16:20–17:02).

There is an agreement between the two companies whereby each benefits from their relationship. (Def. VS's Ex. 7, SM Dep. (J. Smith) 12:9-21:9, 83:11-84:11, 92:11-93:11). Mosaic cannot get involved in a deal unless the Vivint sales representative knocks on a door, opens the credit application, and submits it through Vivint's salesman's iPad. (Id). Further, Mosaic has had several communications with Vivint demonstrating its ability to make "tweaks" to Vivint's sales presentation, and admitting to a "robust partnership" between the two. (Ex. 28, SM-VS Communications at SM 859, 855, 794, 843).

Under these circumstances, where Mosaic has consented to the prearrangement whereby Vivint's sales force could compile and transmit sensitive credit application data to Mosaic, the knowledge and conduct of Vivint's sales agents can fairly be imputed to the principal, Mosaic. *See* RESTATEMENT (3D) OF AGENCY, § 3.01 (agency relationship "is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf").[5]  Specifically, Vivint operated as Mosaic's "special agent" for the limited purpose of obtaining and transmitting consumer credit application data. *See id.* § 2.01, Cmt. d (acknowledging the difference between a "general" agent and a "special" agent, is authorized to conduct a "single transaction" of a "series of transactions specified by the principal").

As such, with respect to Vivint's interactions with Plaintiffs, Vivint's knowledge is Mosaic's knowledge, and Mosaic thereby knew that Plaintiffs did not consent to or initiate a credit transaction.  At the very least, this is an issue of fact for the jury. *See, e.g.*, *Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp.*, 575 F.3d 1180, 1186 (11th Cir. 2009)

---

[5]      To ensure uniformity and predictability, courts have applied federal agency law in matters concerning liability under federal statutes like the FCRA. *Lukens v. Dunphy Nissan, Inc.*, No. 03-767, 2004 WL 1661220, at *4 (E.D. Pa. July 26, 2004) (FCRA case).  The Supreme Court has done so in the context of other federal laws, and has endorsed the use of the Restatement in doing so. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989).

(the "determination regarding the scope of vicarious liability and the principal-agent relationship is a question of fact"); *PWS Envtl. Inc. v. All Clear Restoration & Remediation, LLC*, No. 18-109, 2018 WL 3139736, at *3 n.1 (M.D. Fla. June 27, 2018) ("The questions of whether an agency relationship exists, and its scope, are generally reserved for the fact-finder."); *Hemenway v. Bartoletta*, No. 11-597, 2012 WL 12906318, at *3 (M.D. Fla. Oct. 22, 2012) ("The existence and scope of a principal-agent relationship is generally for the jury to determine.").

Additionally, there is a host of evidence that undermines Mosaic's blind reliance on Vivint to comply with the law, making it *unreasonable* for Mosaic to continue to believe that credit application data submitted by Vivint's agents were for a permissible purpose. Mosaic's recent document dump of nearly 400 pages consists of dozens of consumer complaints that Vivint impermissibly pulled their credit reports. (Ex. 20, SM 309-698). Mosaic had "confirmed" several instances of fraudulent credit pulls by Vivint agents in Florida in 2016, i.e. before the credit pulls in this case. (*Id.* at 383 ("No contest has been received from Vivint so this is being resolved as a confirmed case of Fraud."); *id.* at 000373 ("closing this as confirmed fraud due to the lack of notification of homeowner on credit pull").

In one of the telephone recordings produced, the Mosaic agent admits, "We've had a rash of these [impermissible pulls] with Vivint customers in Florida. I don't know what it is about their team in Florida that is causing this." (Ex. 16, SM 300). Mosaic's decision to continue allowing Vivint to handle the credit application process despite knowing Vivint repeatedly allowed its agents to fraudulently pull credit reports was unreasonable, and willful. Mosaic's knowledge of the problem with Vivint undermined the reasonableness of its purported belief that a credit application submitted through a Vivint agent was for a permissible purpose.

In sum, there is no "reasonable belief" standard applicable to <u>users</u> of consumer reports, like Mosaic and Vivint.  Regardless, whether or not it was *reasonable* for Defendants to believe that Plaintiffs initiated a credit transaction in light of this mountain of evidence to the contrary, is for the jury. *See, e.g.*, *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (reasonableness under FCRA is fact question "normally [] reserved for trial").  Summary judgment must be denied.

### C.  Mosaic is Liable for the False Pretenses Submitted by its Agents

Obtaining a credit report upon false pretenses is criminal. *Pinson*, 942 F.3d at 1214. Mosaic's agents for purposes of running credit – Vivint and its employees Coan and Martins – committed <u>forgery</u> in the course of doing so.   (See Section III.B.iii.2, *infra*, for argument regarding Vivint's special agency relationship with Mosaic). Their intent to deliberately sign someone else's signature, and represent it to be authentic, is imputed to Mosaic.

Further, Mosaic **ratified** the fraudulent conduct of Vivint by continuing to accept the benefits of their business relationship despite confirming several instances of fraud. (*See, e.g.*, Ex. 20, SM 383 ("No contest has been received from Vivint so this is being resolved as a confirmed case of Fraud."); *id.* at 373 ("closing this as confirmed fraud due to the lack of notification of homeowner on credit pull"). *See* Restatement (3d) of Agency § 4.07, Comment b ("A person may not, by ratifying an act, obtain its economic benefits without bearing the legal consequences that accompany the act. For example, if unauthorized representations induce a third party's assent to a contract, ratification of the contract binds the ratifier to the legal consequences of the representations that induced assent to it.").   Mosaic's "ratification retroactively creates the effects of actual authority." *Id.* § 4.02.   A principal like Mosaic "may not, for example, ratify a sale that the agent has made while disaffirming the unauthorized

representations made by the agent to effect the sale. The burdens created by the legal consequences of the transaction accompany its benefits." *Id.* § 4.02, Comment b.

### D.  Mosaic Willfully Violated the FCRA

The FCRA prohibits both willful and negligent violations. 15 U.S.C. §§ 1681n, 1681o. "Willfulness is typically a question of fact for the jury." *Hargrett v. Amazon.com DEDC LLC*, 235 F. Supp. 3d 1320, 1327 (M.D. Fla. 2017) (*citing Miller v. Johnson & Johnson*, 80 F. Supp. 3d 1284, 1296 (M.D. Fla. 2015)).

In 2007, the Supreme Court lowered the bar for what constitutes willful noncompliance, stating that it includes both knowing and reckless violations. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56–57 (2007).  A defendant can willfully violate the FCRA by adopting policies or procedures with reckless disregard as to whether they would result in FCRA violations. *Hinkle*, 827 F.3d at 1307 (holding "[a] reasonable jury could find that [defendant] adopted such a system with reckless disregard for the fact that it would result in perfunctory review in contravention of the FCRA"). Willfulness can also be shown by failing to develop a procedure to prevent future violations, or by failing to follow established procedures despite the "known risk of violating the FCRA." *Williams v. First Advantage LNS Screening Sols. Inc*, 947 F.3d 735, 745-46 (11th Cir. 2020); *see also Cortez*, 617 F.3d at 721 (willful violation "by adopting a policy with reckless disregard of whether it contravenes a plaintiff's rights under the FCRA").  Evidence of intentional trickery, or of repeated misconduct "would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dixon-Rollins v. Experian Info. Sols., Inc.*, 753 F. Supp. 2d 452, 465 (E.D. Pa. 2010) (upholding willfulness verdict).

16

The willfulness inquiry can also look at whether the conduct involved repeated actions or was an isolated incident. *See Williams*, 947 F.3d at 746 (finding willfulness where there were two consecutive violations, and the second one was preventable).  Willfulness violations occur where the defendant, *inter alia*, fails to adopt appropriate procedures, furnishes reports without the consent of the consumers, obtains and furnishes reports under false pretenses, uses bogus names and false reasons, or uses deceit and false pretenses. *See, e.g.*, *Hall v. Harleysville Ins. Co.*, 896 F. Supp. 478, 483 (E.D. Pa. 1995) (impermissible pull case, denying summary judgment).  This record demonstrates an overwhelming amount of such evidence.

First, it is beyond dispute that Mosaic had knowledge of the requirements of the FCRA, as reflected in its policies and its agreements with the credit reporting agencies. (Ex. 34, SM FCRA Policies; Ex. 31, SM Subscriber Agreements).

Second, the record establishes that Defendants acted knowingly, intentionally, and willfully through their agents Coan and Martins. Each salesman knew he did not discuss a credit pull with the Plaintiffs and that they did not give consent for one.  Both Coan and Martins *forged* signatures on PCCF forms simply to create an account. (Oppo to VS facts ¶¶6, 16).  In the case of Martins, he omitted Ms. Cardona's email address to hide the evidence of the fraud. (Id. ¶6). This was a common practice at Vivint, likely known by Mosaic or imputed to them. (Id. ¶¶6–7). This record is replete with evidence of repeated, intentional trickery. *See Dixon-Rollins*, 753 F. Supp. 2d at 465.

Third, Mosaic's knowledge about Vivint's misconduct goes beyond mere "recklessness" sufficient to sustain punitive damages—it can only be characterized as willful enabling and ratification of the frauds they committed in violation of the FCRA.  In Florida alone, Mosaic has received no less than 30 complaints of fraud or impermissible pulls by Vivint for the period of

time limited as relevant by this Court, and likely many more across the country. (Ex. 20, SM 372, 375, 382, 401, 408, 412, 416, 420, 429, 437, 440, 451, 458, 463–464, 468, 477–478, 480–481, 495, 562–563, 570, 574–575, 596, 628, 630, 639, 649–650, 657, 664, 672).  In a telephone call, one Mosaic agent admits, "**We've had a rash of these [impermissible pulls] with Vivint customers in Florida.  I don't know what it is about their team in Florida that is causing this.**"  (Ex. 16, SM 300).[6]  Mosaic apparently raised the issue with Vivint's "upper management" in October 2016, and later that month, Mosaic told a consumer-victim that "Vivint has committed to re-training their sales reps to position our credit check in an appropriate manner going forward[.]" (Ex. 20, SM 357).

So Mosaic certainly knew that Vivint's sales force required more training.  But when the complaints continued, Mosaic did not discontinue its business dealings with this known lawbreaker or take any meaningful remedial action to prevent it from occurring in the future.  Instead, Mosaic abdicated responsibility for Vivint's lawlessness and merely told Vivint to "use this as a training opportunity[.]" (Ex. 20, SM 443, 453, 464, 479, 485, 564, 569, 575, 629, 665).  Mosaic surely knew at that point that such lip service would not stop Vivint from continuing to violate the FCRA, as they admitted to several "spikes" in "Fraud/Compliance/Complaint" issues over the course of 2017. (Ex. 28, SM-VS Communications, SM 866-67).  Mosaic's actions demonstrate it consciously disregarded the known risk that Vivint would offend again.  All this is evidence of willfulness. *See Williams*, 947 F.3d at 745–46; *Hall*, 896 F. Supp. at 483.

### E.  Plaintiffs are Entitled to their Actual Damages for Emotional Distress

The FCRA permits recovery of "actual damages" for negligent and willful violations. 15 U.S.C. §§ 1681n & 1681o.  For willful violations, a plaintiff is entitled to "actual damages" of at

---

[6]     Call recordings with consumer-victims confirm that Mosaic was on notice of a pattern of fraud and impermissible pulls perpetrated by Vivint. (Ex. 33, Select Phone Calls between SM and Consumers).

least $100. 15 U.S.C. § 1681n(a)(1)(A). However, actual damages need not be proved to establish a willful violation. *Levine v. World Fin. Network Nat. Bank*, 437 F.3d 1118, 1124 (11th Cir. 2006) (for willfulness claims, "the existence of compensable emotional distress is relevant to the amount of damages a plaintiff will ultimately recover, not to whether an individual has adequately stated a prima facie claim").

The Eleventh Circuit has recognized that an FCRA plaintiff is entitled to emotional distress damages caused by the violation. *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1304 (11th Cir. 2019).   Other courts of appeal have found that emotional and psychological harm, embarrassment, humiliation, and mental distress are "precisely" the type of harms to flow from FCRA violations. *Cortez*, 617 F.3d at 719.  "[D]amages for violations of the FCRA allow recovery for humiliation and embarrassment or mental distress even if the plaintiff has suffered no out-of-pocket losses" or credit denials because of the violation. *Id.* at 719.

Defendants argue that Plaintiffs cannot rely on their own testimony to recover emotional distress damages.  However, in *Cortez*, the Third Circuit persuasively refused to adopt a damages standard conditioning emotional distress damages on corroborating evidence:

> Such corroboration goes only to the weight of evidence of injury, not the existence of it. If a jury accepts testimony of a plaintiff that establishes an injury without corroboration, the plaintiff should be allowed to recover under the FCRA. The fact that the plaintiff's injuries relate to the stress and anxiety caused by the defendant's conduct does not change that. This is precisely the kind of injury that Congress must have known would result from violations of the FCRA.

*Id.* at 720.

While it is true that some courts have required that emotional distress damages be corroborated by other evidence, such a requirement has no place in this remedial consumer protection law, which must be liberally construed in favor of consumers. *Bruce*, 2015 WL

5797846, at *10 n.3 (citing cases).[7]   The plain text provides for "actual damages," without qualification. 15 U.S.C. §§ 1681n & 1681o.  Recognizing this, courts across the country have readily concluded that a plaintiff's own testimony describing their emotional distress is sufficient to send the issue of damages to the jury. *See, e.g.*, *Graham v. CSC Credit Serv., Inc.*, 306 F. Supp. 2d 873, 880 (D. Minn. 2004) (consumer's testimony about his frustration, anxiety, and humiliation created an issue of fact regarding his damages for emotional distress); *Drew v. Equifax Info. Servs., L.L.C.*, 690 F.3d 1100 (9th Cir. 2012) (evidence of emotional distress experienced as a result of furnisher's misreporting was sufficient to survive summary judgment); *Wells v. Craig & Landreth Cars, Inc.*, 2012 WL 6487392 (W.D. Ky. Dec. 13, 2012) (denying summary judgment predicated in part on damages being limited to plaintiff's own testimony regarding her emotional distress caused by impermissible access); *Bradshaw v. BAC Home Loans Serv., Ltd. P'ship*, 816 F. Supp. 2d 1066, 1076 (D. Or. 2011) (plaintiffs' own description of emotional distress suffered due to credit denials adequate to withstand summary judgment).

Here, in addition to the invasion of privacy and out-of-pocket loss (as to Cardona), Plaintiffs credibly testify to anxiety, fear, anger and worry they suffered due to the access of their credit information without their consent. (Oppo to VS facts ¶¶14, 22).  They also testify as to how that emotional distress manifested itself physically, though this is not required under the FCRA case law.  (Id.).  Both have also introduced sworn statements from their spouses, who have observed the effects of the distress caused by defendants' actions. (Id.).  These damages are compensable and are to be determined by a jury.

---

[7]     Indeed, the Eleventh Circuit recently affirmed a jury verdict for actual damages based on reputational harm even though "the evidence of reputational harm was not earth-shattering[.]" *Williams*, 947 F.3d at 744.

## IV.   <u>CONCLUSION</u>

For all the reasons set forth in this brief and the substantial record of systemic and pervasive consumer fraud in willful violation of the FCRA, Defendant's Motion for Summary Judgment must be denied.

Respectfully submitted:

Date: <u>February 18, 2020</u>

<u>/s/ Andrew M. Milz</u>

ANDREW M. MILZ
JODY T. LOPEZ-JACOBS
*Admitted pro hac vice*

FLITTER MILZ, P.C.
450 N. Narberth Avenue, Suite 101
Narberth, PA 19072
(610) 822-0782 (ph)
(610) 667-0552 (fax)
amilz@consumerslaw.com

CRAIG E. ROTHBURD
FBN: 0049182
320 W. Kennedy Blvd., #700
Tampa, Florida   33606
(813) 251-8800 (ph)
(813) 251-5042 (fax)
crothburd@e-rlaw.com
mropp@e-rlaw.com

**ATTORNEYS FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on February 18, 2020, the foregoing was filed with the Clerk of the Court

using the CM/ECF system, which will send a notice of electronic filing to counsel of record.


*/s/ Andrew M. Milz*
CARY L. FLITTER
ANDREW M. MILZ
JODY THOMAS LÓPEZ-JACOBS

FLITTER MILZ, P.C.
450 N. Narberth Avenue, Suite 101
Narberth, PA 19072
(610) 822-0782

**ATTORNEYS FOR PLAINTIFFS**